(unmodified opinion attached)

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Butte)

----

| | |
|---|---|
| In re E.C. et al., Persons Coming Under the Juvenile Court Law. | C097741 |
| BUTTE COUNTY DEPARTMENT OF EMPLOYMENT AND SOCIAL SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>S.C. et al.,<br><br>Defendants and Appellants. | (Super. Ct. Nos. 22DP00213, 22DP00215)<br><br>ORDER MODIFYING OPINION AND DENYING REHEARING<br><br>[NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed on May 24, 2024, be modified as follows:

1.      On page 2, in the last sentence before the heading "FACTUAL AND PROCEDURAL BACKGROUND," the words "for further disposition" are added between "remanded" and "to."  As modified, this sentence now reads:

> The matter is remanded for further disposition to enable the court to consider father's request that he be elevated from alleged father status and to reconsider whether he should be provided reunification services.

1

2.    On page 26, at the end of the paragraph immediately preceding the heading "Disposition," the following sentence and footnote are added:

> Accordingly, we shall remand for further disposition to enable the juvenile court to determine whether to provide father with family reunification services pursuant to section 361.5, subdivision (a)(1)(B).[8]
>
> [8]    The provision of reunification services would be pursuant to section 361.5, subdivision (a)(1)(B), because E.C. was under the age of three at the time of her initial removal.  Of course, any continued provision of reunification services thereafter must comply with the statutory timeframes based on the date of E.C.'s initial entry into foster care, placement into protective custody, detention, and/or removal.  (See § 361.5, subd. (a)(1)(B); *San Joaquin Human Services Agency v. Superior Court* (2014) 227 Cal.App.4th 215, 222-223.)

This modification does not change the judgment.  The petition for rehearing is denied.

BY THE COURT:

 /s/
DUARTE, Acting P. J.

 /s/
BOULWARE EURIE, J.

 /s/
WISEMAN, J. Pro Tem.[*]

[*] Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Butte)

----

| | |
|---|---|
| In re E.C. et al., Persons Coming Under the Juvenile Court Law. | C097741 |
| BUTTE COUNTY DEPARTMENT OF EMPLOYMENT AND SOCIAL SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>S.C. et al.,<br><br>Defendants and Appellants. | (Super. Ct. Nos. 22DP00213, 22DP00215) |

Appellants S.C. (father) and C.S. (mother), parents of minors E.C. and A.J., appeal from the juvenile court's jurisdictional and dispositional orders finding the minors come within the provisions of Welfare and Institutions Code section 300, adjudging the minors dependents, and removing them from parental custody.  (Welf. & Inst. Code, §§ 300,

1

361, 395.)[1] Parents contend the evidence was insufficient to support jurisdiction and removal. Father argues separately that the juvenile court erroneously failed to consider his request to be elevated to presumed father status of E.C. and that he was improperly bypassed for reunification services.

We reverse the juvenile court's jurisdictional orders as to the minor A.J. The matter is remanded with directions to vacate all subsequent orders stemming from these orders and to hold a new jurisdiction hearing.

We affirm the juvenile court's jurisdictional and removal orders as to the minor E.C. However, we reverse the juvenile court's order denying father reunification services. The matter is remanded to enable the court to consider father's request that he be elevated from alleged father status and to reconsider whether he should be provided reunification services.

FACTUAL AND PROCEDURAL BACKGROUND

*The Section 300 Petitions*

On September 13, 2022, the Butte County Department of Employment and Social Services (Department) filed a section 300 petition, pursuant to subdivisions (a) (serious physical abuse) and (b) (failure to protect), on behalf of then newborn E.C. The petition was based on mother's ongoing substance abuse and use of methamphetamine during pregnancy and father's failure to protect the minor from mother's substance abuse. E.C. had been born prematurely and tested positive for methamphetamine at birth.

Mother had not received any prenatal care and had cancelled her only scheduled prenatal appointment. Mother had admitted to using methamphetamine two days prior to E.C.'s birth and multiple other times during the pregnancy. The petition further alleged that father was aware of mother's substance abuse and failed to protect E.C., that he also

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

has an untreated substance abuse issue, and that parents' substance abuse issues hinder their ability to provide protection, supervision, and care.

Mother denied having substance abuse issues and claimed she used methamphetamine "socially" and had not expected to go into labor. Father reported that he knew mother would use methamphetamine when she went to visit friends in Cohasset, California while she was pregnant, and that E.C.'s 18-month-old half sibling, A.J., would stay home with him. Father claimed to have been drug free since 2002. The Department had attempted to make a safety plan with father, but father failed to comply with the conditions of the plan by not submitting to a drug test on September 9, 2022.

Also on September 13, 2022, the Department filed a nondetaining section 300 petition, pursuant to subdivision (b) (failure to protect), on behalf of then 18-month-old A.J. The petition was based on mother's ongoing substance abuse, mother's use of methamphetamine during her pregnancy with A.J.'s half sibling E.C., and E.C. being born with a positive toxicology test. The petition further alleged, pursuant to section 300, subdivision (g), that A.J.'s alleged biological father (T.S.J.) was currently incarcerated and had left her without any support.

Mother drug tested on September 13, 2022. Her test was positive for methamphetamine and amphetamine. Father tested on September 14, 2022, and his test results were positive for methamphetamine and alcohol.

E.C. was ordered detained on September 15, 2022.

An amended section 300 petition was filed on behalf of A.J. on November 1, 2022. The petition sought detention of A.J. and added the allegations that since E.C.'s removal, mother had continued to use methamphetamine, and that mother "continues to allow her significant other [father] into her home and engages in acts of domestic violence in front of the child, placing the child at risk of physical harm." A protective custody warrant was issued and A.J. was ordered detained on November 10, 2022.

*Family Background*

E.C. is mother's fifth child. One of her children, T.J.,[2] is in a legal guardianship with the maternal grandmother, and two of her children live with their father. T.J. was born in October 2019. Mother tested positive for methamphetamine during her pregnancy with T.J., although she claimed she had ingested it accidentally.

Mother told a social worker who visited her shortly after T.J.'s birth that she was breastfeeding T.J. The social worker provided mother with literature about the dangers of methamphetamine and the impact its use can have on children and the family. The maternal grandmother reported that, during the ensuing months, mother kept showing up at her house under the influence, was struggling to provide for T.J., and eventually "gifted" the child to the maternal grandparents to raise. By August 2020, the maternal grandparents were applying for guardianship of T.J. Mother denied that she was using drugs or alcohol but agreed to the guardianship.

Mother's fourth child, the minor A.J., was born in February 2021. Mother tested positive for methamphetamine at her only prenatal appointment. Although A.J. was exposed to controlled substances in utero, both she and mother tested negative at the time of A.J.'s birth. Mother also breastfed A.J., who did not show any signs of withdrawal.

A.J. resided with mother at the time of E.C.'s birth. Father, who also resided with mother, had been present at E.C.'s birth and reportedly signed a declaration of paternity. A.J.'s alleged biological father was incarcerated and unable to confirm paternity. It was reported that father, although not A.J.'s biological father, acted as the father figure in the home.

Father has four biological children and three stepchildren, none of which are in his care. Both mother and father have substantial separate child welfare histories with

---

[2] T.J. is not a subject of the underlying case or this appeal and is mentioned where relevant only for context.

numerous referrals, primarily for general neglect and domestic violence, but they did not have any prior referrals as a couple or coparents. Father's prior child welfare history includes a November 2015 referral for domestic violence that resulted in the termination of father's reunification services and, in June 2019, termination of his parental rights to one of his children.

On November 8, 2022, father filed a JV-505 parentage statement representing that he had already established parentage for E.C. by signing a voluntary declaration of paternity on September 8, 2022, and by supporting mother and the unborn child during mother's pregnancy.

*E.C.'s Jurisdiction Hearing*

E.C.'s jurisdiction hearing took place on November 15, 2022. Prior to the hearing, mother had submitted to drug tests on September 13, 2022, October 11, 2022, and October 14, 2022. The results were presumptively positive for methamphetamine on each date, but the lab results came back negative (with the exception of a positive alcohol result on Sept. 13, 2022). Father had refused to drug test after his initial positive test on September 14, 2022. The juvenile court instructed both parents to drug test and trailed the matter to the afternoon. Mother's test was negative but father refused to test.

Mother's appointed counsel declared a conflict with her client and asked to be relieved. The juvenile court granted the request and also granted mother's request to proceed in propria persona. Later in the hearing, father stated he had a conflict with his appointed counsel and requested he also be permitted to proceed in propria persona. The juvenile court granted his request.

The jurisdiction report and social workers' testimony elaborated on the allegations in the petition, noting that although E.C.'s gestational age was unknown, the child's Ballard score was 34 weeks, evidencing that the minor was born prematurely; that mother had admitted to using methamphetamine several times during her pregnancy; and that both mother and E.C. had tested positive for methamphetamine on September 7, 2022.

5

Father had been contacted at 8:45 a.m. on September 8, 2022, to arrange a safety plan that included father submitting to a drug test that day. The social worker returned three times that day, emphasizing that father needed to test immediately and telling him to test by 1:00 p.m. Father had not tested by 2:20 p.m. Law enforcement detained E.C. at 2:40 p.m. on September 9, 2022.

Neither parent testified at the hearing. Father filed a written statement in response to the jurisdiction report alleging he did not know mother had used methamphetamine during her pregnancy until she was at the hospital giving birth to E.C. He also alleged he had intended to drug test in connection with the safety plan but had been looking for someone to care for A.J. while he tested. Before he could do so, E.C. was detained. Although father's written statement represented that it was executed under penalty of perjury, it was unsigned.

The juvenile court found each of the allegations in E.C.'s section 300 petition to be true. The court noted that it believed parents' methamphetamine use posed a safety issue for a newborn child.

*A.J.'s Jurisdiction Hearing and E.C.'s Disposition Hearing*

A.J.'s jurisdiction hearing, held in conjunction with E.C.'s disposition hearing, took place on December 6 and 8, 2022. Neither parent testified.

In A.J.'s jurisdiction report, the social worker reported that, prior to A.J.'s detention, the social worker had met with mother to establish a safety plan for A.J. to remain in the home. The social worker expressed concern about father's substance abuse, his refusal to test or participate in any services, and father being in the home without mother having a plan in place to protect A.J. Mother said she would talk to father when he got home.

Approximately one week later, on October 19, 2022, mother called the social worker and reported she had spoken to father and confronted him about his methamphetamine use. When mother asked to see his phone, father broke it, and then

6

took her phone and her car. Mother acquired a new phone and, with A.J., walked to her visit with E.C. that day. Father later returned mother's car to her. The social worker reported that mother sounded stressed on the phone when she told her about the incident, but there was no indication that law enforcement was called or involved.

In E.C.'s disposition report, the social worker reported that E.C. had both methamphetamines and amphetamines in her system at birth. Mother had also been smoking cigarettes daily during pregnancy and had not received any prenatal care. Due to E.C.'s exposure to controlled substances in utero, E.C. had experienced withdrawal symptoms. After being released from the hospital, E.C. had trouble feeding and slept frequently. She had difficulty latching and needed extra encouragement. She also experienced leg and arm tremors during the first month of her life. These symptoms had since improved.

The social worker reported that mother's untreated mental health issues appeared to be exacerbated by her substance abuse, and that mother had demonstrated "impaired judgement [*sic*] making" in meetings. Her behavior had become increasingly reactive and concerning. Mother was still being dishonest about her substance abuse and had not taken responsibility for her actions and E.C.'s exposure to drugs and withdrawal symptoms. She had not demonstrated any understanding of how her substance use had affected her judgment. Mother took responsibility only for having a cluttered home, and had to be reminded that the home conditions were not why E.C. was removed. Mother continued to believe it was safe for father to be around her children, and she claimed to be ignorant of his drug use. She could not verbalize how she would keep her children safe from father if he was using drugs.

The Department requested E.C. be removed from parental custody and that mother be provided with reunification services for E.C. However, the Department requested father be bypassed for reunification services pursuant to section 361.5, subdivisions (a)(1), (b)(10), and (b)(11).

7

Parents were still living together at the time of the hearing. Father had not submitted to any further drug testing, would not meet with the social workers, or participate in any services or visitation. Mother had tested twice for drugs since E.C.'s jurisdiction hearing and both tests were negative for controlled substances. Despite the negative tests, the social worker reported mother's behavior continued to be erratic, as "evidenced by aggressive questioning in the [c]ourtroom," and by her being confrontational with the social workers.

In sustaining the petition and assuming jurisdiction over A.J., the juvenile court acknowledged that mere drug use by a parent is not a sufficient basis upon which dependency jurisdiction can be found. It then noted that "substance abuse by a parent can be prima facie evidence of a parent's inability to provide regular care, resulting in substantial risk of physical harm. In particular -- and a case may depend on the age of the child. And for children of tender years, substance abuse by a parent is prima facie evidence of such risk." The juvenile court then commented that this was not an instance of a single positive test, although mother's most recent tests had been negative. The court also considered that father was in the home and had tested positive but was now refusing to test or cooperate, leaving the court with no way of knowing whether his illegal drug abuse was continuing. The court found this created a substantial risk to the minors who, the court again emphasized, were of "very tender age."

With respect to E.C.'s disposition, the juvenile court adjudged her to be a dependent and found reasonable efforts had been made to prevent the need for her removal, but that removal was necessary, as there was a substantial danger to E.C.'s physical health, safety, protection, or emotional well-being. The court ordered reunification services be provided to mother but denied them for father. In denying father reunification services, the juvenile court found by clear and convincing evidence that he was an alleged father and there was no statutorily presumed father. Thus, the juvenile court found bypass of father to be appropriate 1) under section 361.5,

8

subdivision (a) (no statutorily presumed father), 2) pursuant to section 361.5, subdivision (b)(10) (reunification services for sibling previously terminated), and 3) based on section 361.5, subdivision (b)(11) (parental rights over a sibling previously terminated).

*A.J.'s Disposition Hearing*

A.J.'s disposition report was filed on January 3, 2023.  The Department recommended the minor be removed and mother be provided with reunification services.  Mother had enrolled in an intensive outpatient drug treatment program but had difficulty admitting her substance use and the effect it had on A.J.  Her drug tests were all negative and she had been visiting A.J. twice a week.  Father had not visited and had stated he was not interested in participating in services since the minor should be returned to his care.  The Department recommended that both father and T.S.J., as alleged fathers,[3] be bypassed for reunification services pursuant to section 361.5, subdivision (a), and that father also be bypassed pursuant to section 361.5, subdivision (b)(10) and (b)(11).  The Department recommended that T.S.J. be bypassed pursuant to section 361.5, subdivision (e) (incarceration).

Father filed a JV-505 form regarding parentage for A.J. on January 4, 2023.  In it, he stated he believed he was A.J.'s parent based on his taking her into his home and supporting her.  He noted that he and mother had married on November 18, 2021, and requested a judgment of parentage be entered.

A.J.'s disposition hearing took place on January 24, 2023.  At the hearing, the juvenile court found father to be the presumed father of A.J.  Neither parent testified, and although mother filed two written statements, neither was signed under oath.  The social worker testified and recommended offering reunification services to mother, but not to return A.J. to mother's custody, due to the risks of potential domestic violence and drug

---

[3] Father was listed in A.J.'s disposition report as an alleged father not as to A.J., but as to her half sibling, E.C.

9

use.  Father had remained in the home, there was no safety plan in place, and the Department had been unable to assess father as the other adult in the home due to his refusal to cooperate.  The Department indicated it had no way of assessing father's sobriety or ability to provide a safe environment.  Further, mother had indicated she has difficulty identifying when father is sober or under the influence of illicit substances.

The juvenile court declared A.J. to be a dependent child of the court and ordered her removed from parental custody.  Mother was provided with reunification services, but father was bypassed for services pursuant to section 361.5, subdivision (b)(10) and (b)(11).

## DISCUSSION

## I

### Juvenile Court Jurisdiction

Both mother and father challenge the juvenile court's jurisdiction, arguing the allegations in the petition were not supported by substantial evidence.  The Department has the burden to prove jurisdiction by a preponderance of the evidence.  (§ 355, subd. (a); *In re I.J.* (2013) 56 Cal.4th 766, 773; *In re Matthew S.* (1996) 41 Cal.App.4th 1311, 1318.)  We review jurisdictional findings for substantial evidence, reviewing the record in the light most favorable to the judgment and drawing all reasonable inferences from the evidence to support the findings and orders of the dependency court.  (*In re I.J.*, at p. 773.)  As we shall explain, we conclude the evidence is sufficient to support jurisdiction over E.C., but reverse the jurisdictional findings as to A.J., and remand for further proceedings.

A.  *Applicable Law*

The juvenile court has jurisdiction to declare a child to be a dependent of the court pursuant to subdivision (a) of section 300 when, as alleged with respect to E.C., the child "has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent or guardian."  (§ 300, subd.

10

(a).)  "For purposes of this subdivision, a court may find there is a substantial risk of serious future injury based on the manner in which a less serious injury was inflicted, a history of repeated inflictions of injuries on the child or the child's siblings, or a combination of these and other actions by the parent or guardian that indicate the child is at risk of serious physical harm."  (*Ibid*.)

The juvenile court has jurisdiction to declare a child to be a dependent of the court pursuant to subdivision (b) of section 300 when, as alleged with respect to both E.C. and A.J., the child "has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of any of the following:  [¶]  (A) The failure or inability of the child's parent or guardian to adequately supervise or protect the child.  [¶] . . . [¶]  (D) The inability of the parent . . . to provide regular care for the child due to the parent's . . . mental illness, developmental disability, or substance abuse."  (§ 300, subd. (b).)

"When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence.  In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence."  (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 451.)  Moreover, "a jurisdictional finding good against one parent is good against both.  More accurately, the minor is a dependent if the actions of either parent bring her within one of the statutory definitions of a dependent."  (*In re Alysha S.* (1996) 51 Cal.App.4th 393, 397.)  Thus, "a juvenile court may take jurisdiction over a child even if only one of the child's parents is unsuitable."  (*In re Janet T.* (2001) 93 Cal.App.4th 377, 392, fn. omitted.)  "We will not reverse for error unless it appears reasonably probable that, absent the error, the appellant would have obtained a more favorable result."  (*In re Jonathan B.* (1992) 5 Cal.App.4th 873, 876.)

11

"[W]ithout more, the mere usage of drugs by a parent is not a sufficient basis on which dependency jurisdiction can be found." (*In re Drake M.* (2012) 211 Cal.App.4th 754, 764; *In re J.A.* (2020) 47 Cal.App.5th 1036, 1046.) Thus, a parent's drug *use*, by itself, is not necessarily sufficient to support jurisdiction. However, the Legislature has declared that "[t]he provision of a home environment free from the negative effects of substance abuse is a necessary condition for the safety, protection and physical and emotional well-being of the child." (§ 300.2.)

B. *Analysis as to E.C.*

The juvenile court sustained E.C.'s section 300 petition under subdivision (a) relating to mother based on E.C.'s positive toxicology test for methamphetamine at birth and mother's use of methamphetamine two days prior to the birth and multiple times during pregnancy, with no prenatal care. Under section 300, subdivision (b)(1), the juvenile court also sustained the petition on these same facts as to mother, as well as based on her ongoing untreated substance abuse.

With respect to father, the court sustained the petition under section 300, subdivision (b)(1) based on father's awareness that mother used methamphetamine during her pregnancy, his failure to dissuade mother from continuing to use drugs, his failure to participate in a safety plan, and his own ongoing, untreated substance abuse.

"A court 'need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child.' [Citation.] And a parent's ' " '[p]ast conduct may be probative of current conditions' if there is reason to believe that the conduct will continue." ' [Citation.] However, ' "[t]o establish a defined risk of harm at the time of the hearing, there 'must be some reason beyond mere speculation to believe the alleged conduct will recur.' " ' " (*In re S.F., supra*, 91 Cal.App.5th at pp. 712-713; see *In re J.A., supra*, 47 Cal.App.5th at p. 1048; *In re L.W.* (2019) 32 Cal.App.5th 840, 849.)

As we have mentioned, the evidence presented at E.C.'s jurisdiction hearing suggested that E.C. was born prematurely; that mother had admitted to using methamphetamine several times during her pregnancy; and that both mother and E.C. had tested positive for methamphetamine on September 7, 2022. E.C. was born addicted to methamphetamine because of mother's substance abuse. There was evidence mother's substance abuse would continue, as mother had developed a pattern of using methamphetamine during her pregnancies, breastfeeding her children, and continuing to use methamphetamine. Despite mother's recent negative tests, there was reason to believe her long-standing pattern of substance abuse would continue.

Finally, E.C.'s very young age supported the juvenile court's conclusion that mother's substance abuse placed E.C. at substantial risk of serious physical harm. (See *In re N.R.* (2023) 15 Cal.5th 520, 559 ["a child's youth and maturity level can bear upon the care that the child may require and whether a parent's or guardian's substance abuse places the child at substantial risk of serious physical harm"].) E.C. had already suffered this type of harm as a result of mother's substance abuse during pregnancy.

This evidence was sufficient to assume jurisdiction over E.C. As a result, we need not address the evidence supporting the other jurisdictional allegations. (*In re I.A.* (2011) 201 Cal.App.4th 1484, 1492 [no need to address evidentiary support for any remaining jurisdictional findings once a single finding has been found to be supported by the evidence], overruled in part on another ground in *In re D.P.* (2023) 14 Cal.5th 266, 283.) In any event, there was no evidence refuting the allegations, which are supported by the statements of the social worker and the fact that father was aware of mother's substance abuse during pregnancy and did nothing to dissuade her from continuing to use. Consequently, the evidence was also sufficient to support the allegation, under section 300, subdivision (b)(1)(A), that father failed or was unable to adequately supervise or protect the child.

C. *Analysis as to A.J.*

Regarding A.J., the amended petition was filed November 1, 2022, under section 300, subdivisions (b)(1) and (g), and she was detained November 3, 2022. A.J.'s petition was based on 1) mother's methamphetamine use as alleged in half sibling E.C.'s petition, 2) mother's ongoing untreated substance abuse issues, and 3) mother allowing father into her home and engaging in acts of domestic violence in front of A.J., thereby placing A.J. at risk of physical harm under section 300, subdivision (b)(1).

Parents argue the evidence does not support the finding that A.J. is at risk due to mother's substance abuse. We observe that while this appeal was pending, the California Supreme Court issued its opinion in *In re N.R., supra*, 15 Cal.5th 520, which is relevant to our resolution of this case.

*In re N.R.* held under section 300, subdivision (b)(1)(D), that the department "must establish, as separate elements, that (1) substance abuse (2) makes a parent or guardian unable to provide regular care for a child and (3) this inability has caused the child to suffer serious physical harm or illness or creates a substantial risk of such harm or illness." (*In re N.R., supra*, 15 Cal.5th at p. 558.) The California Supreme Court interpreted section 300, subdivision (b)(1)(D), "as assigning the term 'substance abuse' its ordinary meaning—essentially, the excessive use of drugs or alcohol." (*In re N.R.*, at p. 531.) Although the court expressly acknowledged that "a child's youth and maturity level can bear upon the care that the child may require and whether a parent's or guardian's substance abuse places the child at substantial risk of serious physical harm," it disapproved the "tender years presumption" that a " 'finding of substance abuse is prima facie evidence of the inability of a parent or guardian to provide regular care resulting in a substantial risk of physical harm' to a child of ' "tender years." ' " (*Id.* at pp. 559-560.) The court held the juvenile court must ascertain whether the department has met its burden as to each of the elements involved, without shifting the burden to a parent or guardian to rebut a presumption created by a finding of substance abuse. (*Ibid.*)

14

Here, the juvenile court expressly applied the "tender years presumption" that was subsequently disapproved in *In re N.R., supra*, 15 Cal.5th 520. In sustaining the petition and assuming jurisdiction over A.J., the juvenile court acknowledged that the mere usage of drugs by a parent is not a sufficient basis upon which dependency jurisdiction can be found. But it then noted that "substance abuse by a parent can be prima facie evidence of a parent's inability to provide regular care, resulting in substantial risk of physical harm. In particular -- and a case may depend on the age of the child. *And for children of tender years, substance abuse by a parent is prima facie evidence of such risk*." (Italics added.) The court then emphasized a second time that the minors were of "very tender age." Because the juvenile court relied on a presumption that has since been expressly disapproved, we cannot uphold the juvenile court's jurisdictional finding as to A.J. based on mother's substance abuse.

Although our review of jurisdictional findings is for substantial evidence (*In re I.J., supra*, 56 Cal.4th at p. 773), we review the juvenile court's misapplication of relevant law for an abuse of discretion. (*Williams v. Superior Court* (2017) 3 Cal.5th 531, 540; *In re M.W.* (2018) 26 Cal.App.5th 921, 931). Due to the juvenile court's erroneous application of the tender years presumption, we are unable to determine whether substantial evidence supports the jurisdictional ruling as to A.J. based on mother's substance abuse.

As we have noted above, certain evidence from the record is arguably both relevant to, and supportive of, the exercise of jurisdiction. For example, at only 18 months of age, A.J. required a high level of supervision, care and protection, and had very little ability to protect herself, assure her needs were met, or report improper care to a third party. Mother had previously "gifted" half sibling T.J. to the maternal grandparents after struggling to provide for the child while using methamphetamine. Mother has a history of breastfeeding, despite her ongoing methamphetamine use, and of leaving A.J. in the care of father, who was also abusing substances. She had no safety

15

plan in place to protect the minor from father who was living in the home, using methamphetamine, and refusing to drug test or participate in any services. Mother continued to believe it was safe for father to be around her children, and she claimed to be ignorant of his drug use. The social worker reported that mother's untreated mental health issues appeared to be exacerbated by her substance abuse, mother had demonstrated "impaired judgment making" in meetings, and her behavior had become increasingly reactive and concerning. Moreover, despite her methamphetamine use during her last three pregnancies, mother continued to deny having any substance abuse issues at all. She had not demonstrated any understanding of how her substance use had affected her judgment, failed to recognize the risks and impact substance abuse has on her children, and failed to even acknowledge that concern about her substance abuse was the basis for the Agency's involvement.

This evidence, if found true, would arguably support jurisdiction over A.J. However, because the juvenile court relied on the now-invalid tender years presumption, that evidence was neither discussed nor, apparently, relied upon.

Moreover, under the circumstances of this case, we cannot find the improper application of the "tender years presumption" to be harmless error. While a secondary basis for jurisdiction was found—that mother continued to allow father into her home and engaged in acts of domestic violence in front of the child, placing A.J. at risk of physical harm—that allegation was not supported by the evidence. The only evidence of ongoing domestic violence was the single incident in October 2022 where mother asked father about his methamphetamine use and she asked to see his phone. In response, father broke his phone and then took mother's phone and car. There is no evidence of any police involvement. Although mother sounded "stressed" when she told the social worker about the incident, there was no evidence of violence, fear, threats, or anything else that would elevate the situation to one of domestic violence. All other prior reports of domestic violence were at least six years earlier and did not involve mother.

Since there was insufficient evidence to support jurisdiction based on the alternative allegation in the petition that "mother continues to allow her significant other, [father], into her home and engages in acts of domestic violence in front of the child, placing the child at risk of physical harm," we cannot find the juvenile court's improper use of the "tender years presumption" in sustaining jurisdiction based on mother's methamphetamine use to be harmless error. We must, therefore, reverse the jurisdictional findings as to A.J.

When, as here, the juvenile court's application of an incorrect legal standard prevents it from resolving factual disputes, the proper remedy is to reverse and remand for a new hearing under the correct standard rather than to decide the matter on the existing state of the evidentiary record. (*In re Charlisse C.* (2008) 45 Cal.4th 145, 167 [rehearing to apply new standard proper course where juvenile court applied incorrect legal standard]; see also *In re Quentin H.* (2014) 230 Cal.App.4th 608, 620-621; *In re D.M.* (2015) 242 Cal.App.4th 634, 643.) Accordingly, we will remand for a new jurisdiction hearing for A.J. based on the circumstances existing at the time of the new jurisdiction hearing. (See *In re Rocco M.* (1991) 1 Cal.App.4th 814, 824, abrogated on another ground in *In re R.T.* (2017) 3 Cal.5th 622.)

II

E.C.'s Removal from Parental Custody

Parents contend there was insufficient evidence to support removal of both minors from parental custody.[4] We will address only the removal of E.C. from parental custody

---

[4] The parties overlook that father has remained an "alleged father" as to E.C. throughout these proceedings. As a result, he had no right to custody and the removal order removing the minor from parental custody properly applied only to removal from mother. (*In re Zacharia D.* (1993) 6 Cal.4th 435, 451 [only a statutorily presumed father is entitled to reunification services and custody].) However, since (in section III of our discussion, *infra*) we conclude the juvenile court erred in not deciding father's paternity status and remand it for further paternity findings, this opinion considers removal from

17

because we are reversing the jurisdictional orders as to A.J. After doing so, we conclude the order removing E.C. from parental custody is supported by the evidence.

To support an order removing a child from parental custody, the court must find clear and convincing evidence "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parents' . . . physical custody." (§ 361, subd. (c)(1); *In re Heather A.* (1996) 52 Cal.App.4th 183, 193.) The court also must "make a determination as to whether reasonable efforts were made to prevent or to eliminate the need for removal of the minor" and "state the facts on which the decision to remove the minor is based." (§ 361, subd. (e).)

Evidence of past conduct may be probative of current conditions, particularly where there is reason to believe the conduct will continue in the future. (*In re Rocco M., supra*, 1 Cal.App.4th at p. 824.) Removal findings are reviewed under the substantial evidence test, drawing all reasonable inferences to support the findings and noting that issues of credibility are matters for the juvenile court. (*In re Heather A., supra*, 52 Cal.App.4th at p. 193.)

Both parents have a long history of substance abuse. Mother has used methamphetamine during her last three pregnancies, with E.C. being born addicted to drugs and suffering from withdrawal. The maternal grandmother reported mother used to live in a trailer in Cohasset at a place maternal grandmother called a "Meth Camp." The maternal grandmother also reported that, in 2020, mother repeatedly showed up at her house under the influence and let known drug users into the maternal grandmother's home.

---

parental custody based on the safety of the minor in the home with both mother and father present. (See, e.g., *In re H.R.* (2016) 245 Cal.App.4th 1277, 1286.)

18

The maternal aunt reported mother had mental health and substance abuse issues but, despite testing positive for methamphetamine while pregnant with T.J., mother would deny any alcohol or drug use. Father also reported he knew mother used methamphetamine when she went to visit her friends in Cohasset. Yet, despite positive test results, and family members' reports of her methamphetamine abuse, mother maintains she does not have a substance abuse problem. She does not admit to her usage or the effects it has had on her judgment or her children, nor can she identify safe individuals to be present within her home.

Father reported that he started drinking and partying at age 13 and has a history of selling methamphetamine. When asked what drugs he has tried, he stated he had tried them all. He reported he had gone to a recovery center for 90 days in 2002 and claimed he has been clean from drugs for five years. He reported his drug of choice is marijuana and that he previously drank daily. Father has a criminal history for possession of controlled substances in 2002 and 2003. Despite initially reporting that he had not used drugs for five years, the social worker said he reported later (on Sept. 22, 2022) that he had been using methamphetamine daily. He had not only refused to submit to any further drug testing after his September 14, 2022, positive test result, he refused to make himself available to meet with the social workers to discuss services or to allow the social workers to assess the safety of the home.

Mother emphasizes that she was complying with the plan, drug testing, and that her house was clean and appropriate. She does not, however, address her failure to acknowledge the risks her drug use poses to her children or father's positive test and subsequent refusals to test. Father argues the juvenile court should not have considered the extent of parents' progress (or lack thereof) in deciding whether E.C. should be removed because he was under no obligation to complete a case plan prior to disposition. Father does not address, however, 1) his failure to acknowledge his role in allowing E.C. to be exposed to methamphetamine in utero, 2) his lack of compliance with the voluntary

19

safety plan that was created to protect E.C. and prevent the need for removal, 3) his own positive test for methamphetamine after claiming he had not used in many years, or 4) his failure to comply with the court orders to drug test.

Despite parents' ongoing methamphetamine use and E.C.'s exposure resulting in her being born addicted to methamphetamine and having suffered medical symptoms as a result, neither parent even acknowledges that their methamphetamine use is a problem at all. Parents' failure to acknowledge any issues further supports the juvenile court's finding of risk of harm to E.C. (See *In re E.E.* (2020) 49 Cal.App.5th 195, 213 [a parent's refusal to acknowledge responsibility for the conduct giving rise to the dependency proceedings supports finding that children face a current risk of harm]; see also *In re T.V.* (2013) 217 Cal.App.4th 126, 133 ["[a] parent's past conduct is a good predictor of future behavior"].)

Short of removal, there was simply no way for the Department or the juvenile court to ensure that newborn E.C. would not be at risk of harm from the involuntary ingestion of controlled substances either through breastfeeding or from some other form of poor judgment related to parents' substance abuse.

## III

## Presumed Father Status of E.C.

Father contends the juvenile court erred when it "denied [his] request" for presumed father status of E.C. He argues that error was prejudicial since the court applied section 361.5, subdivision (a) (no services required for alleged father) as a basis for denying him reunification services for E.C. at the December 8, 2022, disposition hearing. This contention has merit.

Mother told the juvenile court at E.C.'s September 14, 2022, detention hearing that she and father were not married when E.C. was born, but father was present at the time of her birth on September 7, 2022, and that she and father signed a voluntary declaration of paternity. Father had reported that he is listed as E.C.'s father on the child's birth

20

certificate. The juvenile court trailed the matter for other reasons and did not revisit the issue of paternity on the record upon resumption of the hearing. The juvenile court's September 15, 2022, interim findings and orders characterize father as E.C.'s presumed father.

As we have previously mentioned, on November 8, 2022, father filed a JV-505 form regarding parentage for E.C. On that form, he represented that he had already established parentage by signing a voluntary declaration of paternity on September 8, 2022. He further represented that he had lived with mother since November 2021, supported her, and they planned for E.C.'s conception together. The juvenile court did not make any paternity findings at the subsequent hearing, but its November 10, 2022, findings and orders after the detention hearing again characterized father as E.C.'s presumed father.

The Department's November 30, 2022, jurisdiction report, however, continued to represent that father had yet to gain presumed paternity status for E.C. Similarly, the Department's December 2, 2022, disposition report continued to characterize father's status as one of an alleged father. In argument at the conclusion of the disposition hearing for E.C., the Department argued that father should not be offered reunification services because there had been no evidence presented to refute the allegations supporting bypass pursuant to section 361.5, subdivisions (a)(1), (b)(10), and (b)(11), because "he's, as far as I can tell, not actually been requested to do [*sic*] presumed-father status at this point in time. So[,] he's not entitled to services under [section 361.5, subdivision] (a)(1)."

We conclude that Department counsel's erroneous representation that father had not made a request to be elevated from alleged father status invited the juvenile court's error in finding father remained an alleged father, without consideration of father's JV-

21

505 form,[5] and resultingly bypassing him for reunification services under section 361.5, subdivision (a).[6]

The Department concedes that father may qualify for presumed father status but argues the error was harmless because he would have been bypassed for services, in any event, pursuant to section 361.5, subdivision (b)(10) and (11). We next reject this contention.

IV

Denial of Reunification Services for Father

In addition to bypassing father for reunification services for E.C. under section 361.5, subdivision (a), the juvenile court denied father reunification services (for both minors) under section 361.5, subdivision (b)(10) (finding reunification services for half sibling had previously been terminated) and (b)(11) (parental rights for half sibling had been permanently severed), and found that father had made no efforts to address these issues. The basis for the application of these bypass provisions was a November 2015 referral for domestic violence that resulted in the termination of father's reunification services and, in June 2019, the termination of his parental rights to one of his children. We agree with father's assertion that application of section 361.5, subdivision (b)(10) and (b)(11) is not supported by the evidence.

As with our review of the minors' removal from parental custody, we address the issue of bypassing father for reunification services as to E.C. only, since we are reversing the jurisdictional orders as to A.J. However, as we concluded in our discussion of the

_____

[5] Our discussion relates to father's November 8, 2022, JV-505 form. Father later filed a second, subsequent JV-505 form for E.C. on January 4, 2023.

[6] A presumed father is generally entitled to reunification services. A biological father may be provided reunification services if services are in the minor's best interests. (§ 361.5, subd. (a); *In re A.H.* (2022) 84 Cal.App.5th 340, 349-351.)

22

jurisdictional orders relating to A.J., evidence of current domestic violence was lacking here. Moreover, there was little, if any, connection between the reasons for E.C.'s removal and the reasons for the prior removal of her half sibling.

When a child is removed from the parent's home, reunification services may be offered to the parent " 'in an effort to eliminate the conditions leading to loss of custody and facilitate reunification of parent and child. This furthers the goal of preservation of family, whenever possible. [Citation.]' [Citations.] Section 361.5, subdivision (b) sets forth certain exceptions—also called reunification bypass provisions—to this 'general mandate of providing reunification services.' " (*In re Allison J.* (2010) 190 Cal.App.4th 1106, 1112.) "When the court determines a bypass provision applies, the general rule favoring reunification is replaced with a legislative presumption that reunification services would be ' "an unwise use of governmental resources." ' " (*Ibid.*)

The bypass provisions at issue here—section 361.5, subdivision (b)(10) and (b)(11)—permit a court to bypass a parent for reunification services where the court previously terminated reunification services for a child's sibling because the parent failed to reunify with the sibling who had been removed from the parent, or had parental rights terminated as to the removed sibling, and the court finds by clear and convincing evidence that the parent has not subsequently made a reasonable effort to treat the problems that led to the removal of the sibling of that child from the parent. (§ 361.5, subd. (b)(10), (b)(11).)[7]

---

[7] Section 361.5, subdivision (b) provides in relevant part: "Reunification services need not be provided to a parent or guardian described in this subdivision when the court finds, by clear and convincing evidence, any of the following: [¶] . . . [¶] (10) (A) That the court ordered termination of reunification services for any siblings or half siblings of the child because the parent or guardian failed to reunify with the sibling or half sibling after the sibling or half sibling had been removed from that parent or guardian pursuant to Section 361 and that parent or guardian is the same parent or guardian described in subdivision (a) and that, according to the findings of the court, this parent or guardian has

23

"[T]he Department bears the burden of proving by clear and convincing evidence that (1) the juvenile court had ordered termination of reunification services (under § 361.5, subd. (b)(10)) or had severed parental rights (under § 361.5, subd. (b)(11)) in a prior case involving a sibling or half sibling of the child in the current case; (2) the 'problem[ ] that led to removal' of the sibling or half sibling is the same problem at issue in the current case, insofar as the problem involves the same 'theme' even if it is not identical; and (3) the parent has 'not subsequently made a reasonable effort to treat th[at] problem[ ].' " (*In re Jayden M.* (2023) 93 Cal.App.5th 1261, 1272, fn. omitted.)

We review the juvenile court's order denying reunification services under section 361.5, subdivision (b) for substantial evidence. (*R.T. v. Superior Court* (2012) 202 Cal.App.4th 908, 913-914 & fn. 3; *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995-996.)

As we have recounted, father's prior child welfare history includes a November 2015 referral for domestic violence that resulted in the termination of father's reunification services and, in June 2019, the termination of his parental rights to one of his children. His most recent criminal history includes a March 2015 misdemeanor conviction for inflicting corporal injury upon a spouse or cohabitant and a March 2016 misdemeanor conviction for battery on a spouse or former spouse and a conviction for willful cruelty to a child.

E.C., however, was detained as a result of mother having used methamphetamine during her pregnancy resulting in the minor being born under the influence, her parents'

---

not subsequently made a reasonable effort to treat the problems that led to removal of the sibling or half sibling of that child from that parent or guardian. [¶] . . . [¶] (11) (A) That the parental rights of a parent over any sibling or half sibling of the child had been permanently severed, and this parent is the same parent described in subdivision (a), and that, according to the findings of the court, this parent has not subsequently made a reasonable effort to treat the problems that led to removal of the sibling or half sibling of that child from the parent."

24

methamphetamine abuse, and father's failure to protect the minor from mother's methamphetamine abuse. Domestic violence was not one of the bases for detention. It was not asserted in E.C.'s section 300 petition or in the jurisdiction report. Domestic violence was not mentioned in the disposition report's section assessing the minor's safety in the home. The only mention of anything on the topic in the disposition report, beyond recitation of father's dependency and criminal history, was the social worker's report that, as a result of the October 2022 incident between the parents, mother had decided she no longer wanted father to be considered as the "concurrent plan."

The October 2022 incident was mentioned in the summary, along with father's substance abuse, as an example of mother not recognizing that father might not be a safe individual to have around her children. However, mother was not provided any preliminary services for domestic violence, nor were there any domestic violence related services in the social worker's proposed and ordered case plan for mother and E.C. Thus, the Department did not establish that the problem that led to the removal of the half sibling—domestic violence—is the same problem at issue in E.C.'s case.

In any event, the Department failed to establish that father has not made reasonable efforts to treat the domestic violence that resulted in the basis for the half sibling's removal. While there was no evidence of what steps father took to treat the domestic violence problem that led to the removal and termination of parental rights to the half sibling, there similarly was no evidence to support a finding that the domestic violence problem continued. As we explained in our discussion of jurisdiction as to A.J., the evidence of what occurred in October 2022 when father broke his phone and took mother's phone and car was insufficient to establish the existence of ongoing domestic violence in the home. There was no evidence of any domestic violence involving father after the 2019 termination of his parental rights to the half sibling, or even since his March 2016 conviction for battery on a spouse. As a result, we cannot find there is

25

substantial evidence that the bypass provisions of section 361.5, subdivision (b)(10) and (b)(11) apply to deny father reunification services as to minor E.C.

DISPOSITION

The December 8, 2022, orders of the juvenile court asserting jurisdiction over the minor A.J. based on the November 1, 2022, amended section 300 petition are reversed. The juvenile court is directed to vacate all subsequent orders stemming from these orders and to hold a new jurisdiction hearing and make new findings and orders based on the circumstances existing at the time of the new jurisdiction hearing and consistent with the California Supreme Court's decision in *In re N.R., supra*, 15 Cal.5th 520.

The November 15, 2022, orders of the juvenile court asserting jurisdiction over the minor E.C. are affirmed.  The December 8, 2022, dispositional orders and judgment as to E.C. are reversed to the extent father was bypassed for family reunification services.  The matter is remanded for the juvenile court to determine whether father is a biological or statutorily presumed father and whether he will be provided with family reunification services.  If the juvenile court determines that father should be provided family reunification services, it shall proceed as required by the statutory timeframes from the date of E.C.'s initial removal.

/s/
WISEMAN, J.*

We concur:

/s/
DUARTE, Acting P. J.

/s/
BOULWARE EURIE, J.

---

* Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.